Filed 3/3/21  Borba v. Erickson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MEREDITH BORBA et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> LARRY ERICKSON et al., <br><br> Defendants and Respondents. | F078295 <br><br> (Super. Ct. No. 2014781) <br><br><br> **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Roger M. Beauchesne, Judge.

Figari Law Firm and Barbara E. Figari for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Dana L. Stenvick; Galloway, Lucchese, Everson & Picchi, Michael C. Austin and Christopher A. Tanimasa, for Defendants and Respondents.

-ooOoo-

Plaintiffs Meredith Borba and Frank Borba (collectively, the Borbas) appeal from the judgment entered after the trial court granted summary judgment on their fifth amended complaint, which stated a single cause of action for negligent infliction of emotional distress, in favor of defendants, Larry Erickson, M.D., Gould Medical Group,

and Sutter Gould Medical Foundation (Sutter Gould) (collectively, respondents). The Borbas' claim was based on allegations that, after safely delivering their baby, Dr. Erickson handled the baby in a manner that restricted the baby's airway, causing the baby to be temporarily discolored. Respondents supported their summary judgment motion with three experts' declarations that Dr. Erickson met the applicable standard of care, he did not cause the baby's injuries, and the baby was not injured. The trial court granted the motion after sustaining respondents' evidentiary objections to the expert declaration the Borbas submitted in opposition to the motion.

On appeal, the Borbas contend they established triable issues of fact without expert testimony, which they assert was not required, and, in any event, their expert witness's declaration, which created triable issues of fact, was improperly excluded from evidence. They also contend the trial court erred in: (1) denying their motion to compel discovery concerning respondents' experts, which they brought after respondents filed their summary judgment motion but before the exchange of expert information; and (2) sustaining respondents' demurrer to the Borbas' claim of intentional infliction of emotional distress alleged in their fourth amended complaint. Finding no merit to the Borbas' contentions, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Meredith arrived at the labor and delivery unit at Doctors Medical Center of Modesto (Medical Center) at 8:55 p.m. on January 18, 2014, with spontaneous rupture of her membranes and was admitted as an inpatient at 11:00 p.m. for active labor.[1] Thereafter, she underwent continuous fetal heart rate monitoring with a Doppler

---

[1] Meredith has a Bachelor of Science degree in nursing and became a registered nurse in 2005. Since then she worked as a clinical nurse in the Neonatal Intensive Care Unit at the University of California San Francisco (UCSF) Medical Center, caring for babies from 23 weeks premature to term, and attending deliveries of healthy and sick babies, including high-risk deliveries.

ultrasound; the baby's vital signs were within normal limits the entire duration of monitoring. At 8:30 a.m. the next morning, Meredith was dilated to 10 and was 100 percent effaced, and the baby was doing well based on the monitor readings.

Dr. Erickson was on-call for Meredith's regular doctor, Dr. Robert Altman, and was called to the Medical Center to deliver the baby. It is not uncommon for OB/GYN medical groups to have an OB/GYN on call for each other since labor and delivery can and does occur anytime of the day or night. There was no emergency or emergent circumstance surrounding the course of Meredith's labor, although at one point the nurse instructed Meredith not to push for 10 to 15 minutes, even though she was in "excruciating pain" and felt the need to, because they were waiting for Dr. Erickson to arrive. According to Meredith, while she was in labor, her nurses told her the medical group Drs. Altman and Erickson were affiliated with did not deliver at the Medical Center very often, and Dr. Erickson was "not happy" she was delivering there.

Dr. Erickson was at Meredith's bedside for the delivery at 8:39 a.m. This was the first time during her labor that Meredith was seen by any doctor, including Dr. Erickson, which Meredith found odd. According to the Borbas, Dr. Erickson did not say anything to them when he entered the room and only asked whether the nurse was going to take down the bed into a delivery position or whether he would have to "break it." The nurse responded she would "break down the bed" when he was dressed and ready. Dr. Erickson had only been in the room two and a half to three minutes and barely had his glove on before the baby was delivered. Dr. Erickson did not say anything else during the delivery.

The baby, Boston, was born at 8:43 a.m. and cried at birth. He weighed nine pounds and measured 20.5 inches in length. The Borbas allege immediately after the delivery, Dr. Erickson "grabbed the baby by the neck" with his left hand and "held him up without supporting the baby's weight with his other hand" while cutting the umbilical cord, causing the baby to lose oxygen and "turn blue." Frank described the way

3.

Dr. Erickson was holding Boston as a "choke hold" and saw Dr. Erickson's grip tighten, choking him further. Meredith saw Dr. Erickson hold Boston from behind his neck, with his thumb and fingers "around his neck cutting off his airway."

Meredith started to panic and pled with Dr. Erickson numerous times to give her son to the nurse. She saw Boston change colors from normal newborn coloring to "dark purple," and said he was not breathing or crying; his lips were pursed, his face swollen, and his body "completely limp." Meredith said Dr. Erickson moved very slowly while holding Boston; he was not rushing while he clamped and cut the umbilical cord and did not react to her pleas to hand the baby to the nurse. Meredith felt Dr. Erickson wanted her to suffer because he changed nothing in response to her pleas and she "was suffering, as well as my child."

Dr. Erickson held Boston in this manner for one to two minutes before handing him to nurses. Dr. Erickson testified he held Boston that way because it was the only way to hold him at the time since he was covered with vernix, which was very slippery, and he was not able to get ahold of Boston any other way. Boston began crying again within 15 to 30 seconds after being handed to the nurses.

Boston's newborn examination record does not reflect that he was cyanotic at or anytime following his birth. Dr. Erickson charted Boston's APGAR score[2] as seven at one minute after birth, while the nurses charted it as eight at one minute and nine at five minutes.[3] Boston began breastfeeding shortly after birth without complication. Meredith and Boston were discharged home at 4:50 p.m. the day after his birth.

---

[2] APGAR scores measure a newborn's breathing effort, heart rate, muscle tone, reflexes, and skin color.

[3] Meredith did not agree with the APGAR scores, as nothing was documented about what happened and she did not believe it was possible for Boston to have APGAR scores of eight and nine.

Meredith said employees of the Medical Center were apologetic about what happened. At Meredith's request, the delivery nurse said she would file an incident report; the delivery nurse also said she was going to file a complaint. Meredith asked the pediatrician and nursery nurse to conduct a thorough assessment of Boston's head and neck, telling them he had been held one-handed and "strangled" during delivery. The pediatrician did not say anything in response to Meredith's request and she did not have an opportunity to talk to him after he evaluated Boston.

Following Boston's birth, Meredith experienced anxiety, lack of sleep, sadness and nightmares, which progressively continued. She also experienced overwhelming sadness, difficulty bonding, sleepless nights, constant worry about her baby, anxiety, and panic attacks, which she did not experience with her other children. She became depressed and withdrew from Frank. Dr. Altman diagnosed her with postpartum depression in 2014, as did another doctor she saw that same year.

Meredith's doctor referred her to Anna Glezer, M.D., an assistant clinical professor at UCSF who is board certified in psychiatry and forensic psychiatry, for postpartum and anxiety issues. Dr. Glezer saw Meredith once in person, in April 2016. Dr. Glezer noted Meredith "described her second child's birth and the subsequent symptoms of re-experiencing, avoidance, [and] panic with triggers," which were "consistent with postpartum PTSD." Dr. Glezer further noted Meredith's vulnerability to PTSD may have been due to a prior history of childhood trauma. Dr. Glezer preliminarily diagnosed Meredith with postpartum PTSD based on the information Meredith verbally provided about her experience and symptoms. Meredith's complaints also were consistent with a generalized anxiety condition.

Meredith was concerned about Boston's development. At six months he was not babbling like he should and while his language had improved, it did not progress like her other two children. According to Meredith, the two pediatricians who had seen Boston said they would not know for sure about his development until he was school age.

Meredith admitted she only had her other children to compare Boston to, but he was not developing within the same timeframe as his two siblings.

## I.     This Lawsuit

Meredith, Frank and Boston filed a medical negligence action against Dr. Altman, Tenet Healthcare Corporation (Tenet), and the Medical Center in January 2015. Dr. Erickson subsequently replaced Dr. Altman as a defendant,[4] and Gould Medical Group and Sutter Gould were added as Doe defendants.

A third amended complaint was filed in January 2016, alleging causes of action for medical negligence and battery against all defendants. After the trial court sustained demurrers to the third amended complaint with leave to amend, the Borbas[5] filed a fourth amended complaint against Tenet, the Medical Center, Dr. Erickson, Sutter Gould, and Gould Medical Group, in May 2016, which alleged causes of action for negligent and intentional infliction of emotional distress.

In the fourth amended complaint, the Borbas alleged the following. When Dr. Erickson delivered Boston, he "grabbed the baby by the neck and held him up without supporting the baby's weight with his other hand." The Borbas were "helpless to stop him," though Frank was photographing the birth. Meredith, who was a neonatal intensive care nurse, "pleaded with Dr. Erickson to hand" the baby, who had "started to turn blue," over to her or the nurses, but "Dr. Erickson ignored her, and casually turned to pick something up from his instrument table, and wipe his brow." The Borbas "watched helplessly as the baby was finally handed over to the nurses because Dr. Erickson had caused him to stop breathing." Boston "became cyanotic (turned blue)" after delivery, but "cyanosis was not notated on the Newborn Examination Record," which was attached

---

[4]     Dr. Altman was dismissed from the action without prejudice in March 2016.

[5]     Starting with the fourth amended complaint, Boston was no longer a named plaintiff.

to the fourth amended complaint as an exhibit. The Borbas "were forced to watch" Dr. Erickson "hold their baby until he turned blue," while Dr. Erickson "refused to stop holding the baby by his neck and/or give the baby to any other person, including nurses, who were in the room." Dr. Erickson's action "caused a loss of oxygen" to Boston's brain, which "resulted in developmental delays and difficulties for the baby," and the Borbas sustained both "serious" and "severe emotional distress" as a result of Dr. Erickson's conduct. The fourth amended complaint contained clip art images purportedly depicting respondents' trademark logos and a photograph allegedly of Dr. Erickson holding Boston after birth.

## II. The Demurrer and Motion to Strike

In May 2016, the respondents[6] filed a demurrer and a motion to strike with respect to the fourth amended complaint. In the demurrer, respondents challenged both the negligent and intentional infliction of emotional distress claims on grounds they failed to state facts sufficient to constitute causes of action and were uncertain. (Code Civ. Proc.,[7] § 430.10, subds. (e) & (f).) In the motion to strike, respondents sought, among other things, to strike the photograph and clip art in the complaint. The Borbas opposed both the demurrer and the motion.

The trial court issued a tentative ruling overruling the demurrer as to the negligent infliction of emotional distress claim but sustaining it, without leave to amend, as to the intentional infliction of emotional distress claim. As for the motion to strike, the trial court intended to grant it in part and deny it in part and order the Borbas to remove the clip art and embedded logos, as well as language regarding intentional torts.

---

**6** In November 2017, Tenet and the Medical Center were dismissed from the action with prejudice. They are not parties to this appeal.

**7** Undesignated statutory references are to the Code of Civil Procedure.

7.

A hearing was held on July 6, 2016. Following argument by counsel, the trial court confirmed its tentative ruling with some modifications. In its written order, the trial court stated it sustained the demurrer as to the intentional infliction of emotional distress claim without leave to amend because the complaint failed to state facts sufficient to constitute a cause of action and was uncertain. As for the motion to strike, the trial court ordered the Borbas, among other things, to remove specific intentional tort language and all photographs, clip art, and embedded logos. The trial court ordered the Borbas to file a fifth amended complaint containing one cause of action for negligent infliction of emotional distress.

The Borbas subsequently filed a fifth amended complaint with a single cause of action for negligent infliction of emotional distress based on the same set of facts alleged in the fourth amended complaint, with the photograph and trademark logos removed. As for the elements of the claim, the Borbas alleged the following: (1) Dr. Erickson "performed acts" on Boston "in a negligent manner causing him injury" and "held him during the labor and/or delivery process, which caused him to los[e] oxygen to the brain and turn blue"; (2) the Borbas were present in the delivery room and aware of the injury as it was occurring; (3) as a result of Dr. Erickson's conduct, the Borbas "were forced to endure serious emotional distress … at being forced to watch their baby be deprived of oxygen immediately upon his birth," which "[a]n ordinary, reasonable person would not be able to cope with," and Meredith's feelings were exacerbated because, as a neonatal nurse, she knew the consequences of Dr. Erickson's action but was helpless to stop him; and (4) Dr. Erickson's conduct was a substantial factor in causing the Borbas' serious emotional distress. The Borbas further alleged Dr. Erickson was acting as either an agent or employee of Tenet, the Medical Center, Gould Medical Group or Sutter Gould.

III.    The Summary Judgment Motion

    A.      The Moving Papers

8.

Respondents moved for summary judgment or, in the alternative, summary adjudication, in November 2017. Respondents argued the negligent infliction of emotional distress claim failed as a matter of law for the following reasons: (1) neither parent could recover as bystanders because Dr. Erickson acted within the standard of care and Boston was not injured; (2) neither parent could recover as direct victims because Frank did not have a physician-patient relationship with Dr. Erickson, Dr. Erickson did not breach the standard of care, and Boston was not injured; (3) there was no causal connection between Meredith's alleged emotional injury and Dr. Erickson's conduct; and (4) since the Borbas could not recover against Dr. Erickson, they could not recover against the other respondents.

In support of the motion, respondents submitted declarations from Jeffrey R. Cragun, M.D., and Richard L. Oken, M.D. Respondents also asked the trial court to take judicial notice of an August 2017 declaration of James Byrne, M.D., which the Medical Center submitted in support of its own summary judgment motion.

Dr. Cragun, a licensed physician who is board certified in obstetrics and gynecology, opined all care respondents provided was within the standard of care in the obstetrics and gynecology community, and none of them were negligent at any time during Meredith's or Boston's care and treatment.[8] In Dr. Cragun's opinion there is no specific standard of care as to how an obstetrician is supposed to hold a newborn

---

[8] In rendering his opinion, Dr. Cragun reviewed the fifth amended complaint, Meredith's and Boston's medical records from the Medical Center, Meredith's medical records from Sutter Gould, and the depositions of Meredith and Frank, as well as color photos marked as exhibits to Meredith's deposition. Dr. Cragun stated it was within his experience, training and scope of practice to manage and care for patients undergoing obstetrics and gynecology treatment. He was familiar with and competent to testify to the standard of care for obstetrician/gynecologists, including labor, delivery and the monitoring of mothers and their babies before and after birth. Moreover, since he was board certified in obstetrics and gynecology, he was familiar with birth complications related to infants born with hypoxia or anoxia (decreased or absent oxygen to the brain), as well as such infants' potential adverse outcomes or lack thereof.

9.

immediately following a routine vaginal birth and prior to cutting the umbilical cord. Dr. Cragun explained Boston "was covered, as many infants are, with vernix caseosa, a waxy slippery substance composed primarily of sebum," and noted that according to Frank's testimony, Dr. Erickson held Boston no longer than one to two minutes from the time of spontaneous vaginal birth until he cut the umbilical cord, when he handed Boston to the nursing staff. Dr. Cragun opined Dr. Erickson's action in "safely holding" Boston immediately following the "routine spontaneous vaginal delivery" until he handed Boston to the nursing staff was "not below the standard of care."

Dr. Cragun noted Boston's APGAR scores were within normal limits for a healthy newborn. In addition, the medical records confirmed there were no fetal or neonatal complications, no resuscitation efforts were made, and neither pulse oximetry nor supportive ventilation was needed or provided. Based on these observations, Dr. Cragun opined Boston could not have been injured by Dr. Erickson holding him as described for one to two minutes following birth, as that was an insufficient length of time to cause any brain injury or developmental delays due to any alleged hypoxia or anoxia as the Borbas' insinuated occurred during this limited timeframe. Moreover, there is no evidence in the medical records to indicate Boston had any abnormal vital signs or other clinical signs or symptoms consistent with physical or brain injury, and no indication of concern by Dr. Erickson or any healthcare provider, including the pediatrician who examined Boston prior to discharge or the nursing staff.

Dr. Oken, a licensed physician who is board certified in pediatric medicine, opined to a reasonable degree of medical certainty that: (1) no act or omission during Dr. Erickson's course of care caused "any of plaintiffs' claimed injuries"; (2) the way Dr. Erickson held Boston, which lasted no longer than one to two minutes, "was an insufficient length of time to cause any brain injury or developmental delays" as a result of any alleged hypoxia or anoxia as the Borbas insinuated occurred during this limited timeframe; and (3) Boston "does not have any evidence of physical injury, brain injury,

10.

developmental injury or delays, or any other injury caused from any care rendered by Dr. Erickson." His opinion was based on a number of facts derived from the medical records and the depositions of the Borbas and a nurse practitioner, including: (1) Boston's vital signs, examinations, evaluations, and assessments at the Medical Center, which were "within normal limits from the time of birth to discharge"; (2) Boston's two- and three-year well child examinations, which were "within normal limits"; and (3) the nurse practitioner's examination of Boston in January 2017, which "raised no concern for developmental or speech delays."[9]

Dr. Byrne, a licensed physician who is board certified in obstetrics and gynecology, opined all the obstetrical care and treatment the nursing staff and Dr. Erickson rendered to Meredith and Boston were within the applicable standard of care, and no act or omission "caused, to a reasonable medical probability," any of the claimed injuries. While "[t]here is no specific 'standard of care' as to how an OB/GYN doctor is supposed to hold the newborn baby immediately following a routine vaginal birth and prior to cutting the umbilical cord as depicted in the photographs and as described by the parents," Dr. Erickson's actions in holding Boston "immediately following his routine spontaneous vaginal delivery until handing the baby over to the [Medical Center] nursing staff were not below the standard of care." Finally, Dr. Byrne opined Boston "does not have any evidence of physical injury, brain injury, developmental injury or delays, or any other injury caused from any obstetrical care rendered by" the Medical Center or Dr. Erickson.

---

**9**      Dr. Oken reviewed the Medical Center's records pertaining to Meredith and Boston, as well as Boston's medical records from UCSF Medical Center, Oak Valley Hospital and pediatrician Dr. Cajigas. He also reviewed the deposition transcripts of Meredith and Frank, and Sheila Hernandez-Lee, N.P., who examined Boston in January 2017, as well as color photos marked as exhibits to Meredith's deposition.

11.

The motion originally was set to be heard on February 8, 2018, with trial set for April 24, 2018, but was later reset for August 16, 2018, with trial scheduled for October 30, 2018.

**B.        *The Borbas' Motion to Compel***

In April 2018, the Borbas filed a motion to compel further responses from Dr. Erickson to their request for production of documents. As pertinent here, the request, which the Borbas propounded on December 6, 2017, asked for documents related to communications with the experts who submitted declarations in support of the summary judgment motion, namely, Drs. Cragun and Oken. Dr. Erickson objected to production of these documents based on the attorney-client and attorney work product privileges, explaining that since expert discovery had not occurred, Drs. Cragun and Oken remained consultants and these privileges therefore applied.

The Borbas argued Dr. Erickson improperly relied on the attorney-client and work product privileges because Dr. Erickson made Drs. Cragun and Oken testifying experts by submitting their declarations in support of the summary judgment motion; therefore, privilege or work product objections were invalid. The Borbas asserted these doctors did not review all available information, including Dr. Erickson's deposition and exhibits, as well as Dr. Erickson's physician notes regarding Boston's birth, which made "their declarations lacking in veracity and based upon untenable facts." If confronted with certain admissions in Dr. Erickson's deposition and written discovery responses, the doctors "would at least question, if not reevaluate, their own findings." The Borbas claimed the requested documents were required so they could depose these doctors to properly oppose the summary judgment motion. The Borbas sought monetary sanctions in connection with the motion.

Dr. Erickson opposed the motion, arguing the Borbas were prohibited from conducting expert witness discovery until the expert consultants were designated and disclosed as expert witnesses for trial as provided in section 2034.210. He further argued the Borbas had not met their burden of showing they were entitled to conduct expert discovery for purposes of opposing the summary judgment motion, as provided in *St. Mary Medical Center v. Superior Court* (1996) 50 Cal.App.4th 1531 (*St. Mary*). Finally, Dr. Erickson argued sanctions were inappropriate because the Borbas' motion was meritless and, in any event, there was substantial justification for his positions.

The Borbas submitted a two-page reply, in which they argued they were entitled to "discovery concerning these experts whose declarations are the basis for defendants' [summary judgment motion]," in order "to demonstrate there are [] triable issues of fact requiring denial of the motion."

The trial court adopted its tentative ruling denying the motion to compel when the tentative ruling was not contested. In its May 2018 order, the trial court stated it determined the Borbas were not entitled to further responses as they did not present any "objective facts that Dr. Cragun or Dr. Oken's 'opinions' are based on incorrect facts— which was the deciding factor in *St. Mary*[]." Instead, "[a]t most" the Borbas contended the experts "did not review everything they 'should have reviewed' " in rendering their opinions, but they did not argue the experts' assumptions about the facts of the labor and delivery were wrong or the evidence they claim the experts should have reviewed would actually refute the assumptions made in their declarations. To the contrary, there did not appear to be any dispute as to what happened during the labor and delivery; rather, the dispute was directed at whether Dr. Erickson's actions were within the medical standard of care.

### C. *The Opposition to the Summary Judgment Motion*

The Borbas filed their opposition to the summary judgment motion on August 2, 2018. The Borbas argued summary judgment must be denied because the evidence

13.

established: (1) Boston was injured because he became cyanotic as a result of Dr. Erickson holding him "solely by the neck"; (2) Dr. Erickson breached his duty of care to Boston by holding him by the neck; (3) Meredith was entitled to recover as a direct victim of Dr. Erickson's negligence; (4) Meredith and Frank both were entitled to recover under a bystander theory of liability because they were present during the delivery and witnessed Dr. Erickson injuring Boston; and (5) Meredith's emotional injuries were causally attributed to watching Boston turn blue while Dr. Erickson was holding him by the neck as her pleas to stop went unheeded.

The Borbas submitted the declaration of Kristeen Klaas, R.N., in support of their opposition. Klaas had been a registered nurse since 1978 and worked as a charge nurse in the operating room at San Leondro Hospital. She had been certified in advanced and basic cardiac life support since 1978. She had previous experience as a respiratory therapy technician and had worked in an "ICU Cardiopulmonary Unit" for 12 years, a "GI lab" for 10 years, and a "PACU"[10] for 15 years. She was "CPAN Certified," went to "Operating Room School," and obtained a "Pediatric Advanced Life Support ('PALS') certification." She had worked in the operating room for 15 years. Although she did not state she had any training or experience in labor and delivery or neonatal medicine, she claimed to be "familiar with the standards of care owed to all patients, including delivering mothers and their babies, upon admission to a hospital, as well as throughout the labor and delivery process." She also claimed to be "familiar with the standards of care in how to hold and assess newborns," and "how injuries and patient complaints should be charted."

Klaas had been consulted as an expert witness for the Borbas. She was asked to evaluate the care Dr. Erickson rendered to Meredith and Boston, surrounding the circumstances of the labor and delivery, and formulate expert opinions regarding his

---

[10] According to respondents, a PACU is a post-anesthesia care unit.

14.

compliance with the standard of care. Klaas stated that based on her over 30 years of experience working as a registered nurse in acute care hospitals, she was "knowledgeable about the standards of care for doctors, nurses, and the ancillary staff working with them under the circumstances pertinent to the litigation."

Based on her education, training and experience in the field of acute hospital care nursing and her review of the medical records and depositions of the Borbas and Dr. Erickson, Klaas opined the following: (1) Dr. Erickson breached the standard of care owed Boston by holding him around the neck for one to two minutes following delivery; (2) when Dr. Erickson held Boston by the neck, Boston became cyanotic, defined as bluish or purplish discoloration of the skin or mucous membranes due to tissues near the skin surface having low oxygen saturation, which is a definite sign that respiration is being blocked; (3) there is no medical reason to hold a newborn by the neck during delivery, particularly for one to two minutes "with the fingers grasping almost entirely around the neck," which can cause cyanosis and block blood flow from the carotid artery to the brain; and (4) in her medical opinion, it was below the standard of care for a doctor, nurse, or any staff member participating in a labor and delivery to hold a newborn by the neck for one to two minutes.

Klaas further opined Dr. Erickson breached the standard of care owed Boston and Meredith by failing to record in the medical records the following: (1) complete APGAR score information; (2) that he held Boston solely by the neck for one to two minutes after delivery; and (3) Meredith's complaints. In Klaas's opinion, an APGAR score of seven is outside the normal limits and concerning because it indicates the newborn is experiencing problems or injuries in one or more categories.

The Borbas also submitted photographs of Boston's delivery taken by Boston's grandmother, Lisa Evans, who was present during the delivery. Evans declared that one of the photographs showed Dr. Erickson holding Boston solely by the neck during his delivery.

15.

The Borbas filed a written objection to respondents' request for judicial notice of the declaration of Dr. Byrne, arguing it was not the proper subject of judicial notice. They also filed a "Separate Statement of Additional Material Facts" (unnecessary capitalization omitted), which contained 84 facts they contended established genuine issues of material fact existed that precluded summary judgment or adjudication.

### D. Respondents' Reply

In their reply, respondents argued the Borbas failed to submit admissible expert opinion on the question of whether there had been a breach of the standard of care. Specifically, they argued Klaas was not qualified to opine as to the standard of care of a delivering board-certified obstetrician/gynecologist and whether there was a breach of that standard; therefore, her declaration was insufficient to counter the declarations of the two board-certified physicians. Respondents also argued that because Klaas failed to opine about causation as to the Borbas' alleged injuries, the opinions of Drs. Oken and Cragun that Dr. Erickson did not cause any of the Borbas' alleged injuries must be accepted as conclusive. Finally, respondents argued Klaas was not qualified to opine about, or diagnose, an injury to Boston.

Respondents filed written objections to Klaas's declaration. Respondents first argued the declaration was neither competent nor admissible under Evidence Code section 720 because Klaas was not qualified to render the opinions stated in her declaration. Respondents asserted proof of the breach of the standard of care of a healthcare provider, as well as proof the injury was caused by negligence, required testimony from medical experts, but Klaas was not qualified to render expert opinions on either issue as to the medical care and treatment Dr. Erickson provided. Respondents argued that while Klaas may offer expert testimony regarding the standard of practice in the field of nursing, because she was not a physician or specialist, her statements

16.

regarding the standard of care applicable to physician specialists were inadmissible because they were conclusory, ambiguous, and unintelligible.

Respondents also objected to Klaas's declaration on the ground it lacked foundation because it did not establish a sufficient basis for her conclusory opinions or what she relied on in forming them. Respondents argued her declaration failed to state with particularity the matters upon which her opinions were based, included irrelevant and inadmissible opinions, and was speculative on its face.

### E.     The Trial Court's Ruling

The trial court issued a tentative ruling to grant the motion, explaining there was no question the case involved an issue of medical negligence with respect to Dr. Erickson's actions and any alleged resulting injury Boston suffered. Respondents' moving pleadings, including the expert declarations of Drs. Cragun and Oken, demonstrated there was no triable dispute of material fact that Dr. Erickson's actions in holding the Borbas' son around the neck without supporting the rest of his body fell within the community standard of care, and no act or omission by Dr. Erickson caused Boston injury, as that term is legally defined. While the Borbas attempted to dispute these expert opinions with Klaas's declaration, the trial court sustained respondents' objections to her declaration, as her opinion of Dr. Erickson's actions could not create a conflict sufficient to prevent the motion from being granted. The trial court noted it need not judge whether Dr. Erickson's bedside manner was appropriate, as that issue was not properly before it.

The hearing on the motion was held on August 16, 2018. After noting the issues were whether a negligent infliction of emotional distress claim sounded in malpractice or ordinary negligence, and whether Klaas had the background and training to qualify as an expert so she could opine on Dr. Erickson's behavior, the trial court stated it tentatively believed expert testimony was required and Klaas's declaration did not create a triable issue because she is not an obstetrician/gynecologist. The trial court added it sustained

17.

respondents' objections on all grounds. The Borbas' attorney argued injury was not needed for a negligent infliction claim, Klaas qualified as an expert due to her many years of experience, and the Borbas were not claiming professional negligence. The Borbas' attorney asserted the jury should decide whether ordinary versus professional negligence applied. The trial court, however, believed it had to decide that issue. The attorney responded that was the trial court's purview, but expert testimony was unnecessary because they pled all the facts needed for a "negligent claim," and even if expert testimony were required, Klaas "is an expert having seen so many births."

The Borbas' attorney requested a continuance under section 437c, subdivision (h), should the trial court confirm the tentative ruling, to allow them to present an "OB/GYN declaration or other evidence." The attorney stated the request was not made earlier because they did not feel it was necessary given Klaas's many years of experience. While the Borbas' attorney believed the request was timely, respondents' attorney disagreed and asserted the Borbas had every opportunity to conduct discovery, as the motion had been pending for 10 months, but they chose not to.

The trial court stated it was going to confirm its tentative ruling in its entirety and grant the motion; in addition, the trial court denied the request for a continuance as untimely. The trial court subsequently issued a written order granting the summary judgment motion, denying the request for a continuance, sustaining respondents' objections to evidence in their entirety, and ordering judgment be entered in respondents' favor. Judgment later was entered in respondents' favor, who were awarded their costs of suit.

## DISCUSSION

## I. The Summary Judgment Motion

### A. *Standard of Review*

Summary judgment is proper only if there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (§ 437c, subds. (c), (f).) As

moving defendants, respondents had the initial burden to show the negligent infliction of emotional distress claim was without merit by showing one or more elements cannot be established. (§ 437c, subd. (p)(2).) Once respondents met their initial burden, the burden shifted to the Borbas to produce evidence demonstrating the existence of a triable issue of material fact. (*Ibid.*; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 849.) If the Borbas were unable to do so, respondents were entitled to summary judgment as a matter of law and the motion was properly granted. (*Kincaid v. Kincaid* (2011) 197 Cal.App.4th 75, 82.)

On appeal, our task is to independently determine whether a triable issue of material fact exists and whether the moving party is entitled to summary judgment as a matter of law. (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601.) We consider all the evidence set forth in the moving and opposing papers, except that as to which objections have been made and sustained. (§ 437c, subd. (c).) "We independently review the parties' papers supporting and opposing the motion, using the same method of analysis as the trial court. Essentially, we assume the role of the trial court and apply the same rules and standards." (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1373.) In so doing, we liberally construe the opposing party's evidence, strictly construe the moving party's evidence, and resolve all doubts in favor of the opposing party. (*Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64; *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.*, *supra*, 25 Cal.4th at p. 850, fn. omitted.)

### B.     *Negligent Infliction of Emotional Distress*

"Negligent infliction of emotional distress is a form of the tort of negligence, to which the elements of duty, breach of duty, causation and damages apply. The existence of a duty is a question of law." (*Huggins v. Longs Drug Stores California, Inc.* (1993)

19.

6 Cal.4th 124, 129 (*Huggins*).)  There are two theories of recovery for negligent infliction of emotional distress—the bystander theory and the direct victim theory; the distinction between the two is found in the source of the duty the defendant owed the plaintiff. (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1071, 1072 (*Burgess*).)  As our Supreme Court has explained:  " 'Bystander' claims are typically based on breach of a duty owed to the public in general [citation],[11] whereas a right to recover for emotional distress as a 'direct victim' arises from the breach of a duty that is assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of the defendant's preexisting relationship with the plaintiff."  (*Huggins*, at pp. 129–130.)

A mother may recover damages for emotional distress as a direct victim of medical malpractice inflicted upon her child during childbirth.  (*Huggins*, *supra*, 6 Cal.4th at p. 131, citing *Burgess*, *supra*, 2 Cal.4th 1064.)  In that situation, the obstetrician owes a duty of care to both the mother and her fetus arising from the physician-patient relationship, and "[a]ny negligence during delivery which causes injury to the fetus and resultant emotional anguish to the mother … breaches a duty owed directly to the mother."  (*Burgess*, *supra*, 2 Cal.4th at pp. 1075–1076.)

In such a case, the mother's "claim for emotional distress damages may simply be viewed as an ordinary professional malpractice claim, which seeks as an element of damage compensation for her serious emotional distress.  The elements of a claim for professional negligence incorporate a specific standard of care into the elements of a negligence claim.  'The elements of a cause of action in tort for professional negligence

---

**11**     As our Supreme Court explained in *Burgess*, bystander cases " 'arise in the context of physical injury or emotional distress caused by the negligent conduct of a defendant *with whom the plaintiff had no preexisting relationship, and to whom the defendant had not previously assumed a duty of care beyond that owed to the public in general*.'  [Citation.]  In other words, bystander liability is premised upon a defendant's violation of a duty not to negligently cause emotional distress to people who observe conduct which causes harm to another."  (*Burgess*, *supra*, 2 Cal.4th at pp. 1072–1073.)

are: (1) the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.' " (*Burgess*, *supra*, 2 Cal.4th at p. 1077.)

When the plaintiff is not the defendant's patient, however, courts have not extended the direct victim cause of action to emotional distress derived solely from reaction to another's injury. (*Huggins*, *supra*, 6 Cal.4th at p. 131.) As our Supreme Court noted in *Burgess*, "the physician-patient relationship critical to a mother's cause of action is almost always absent in a father's claim" for negligent infliction of emotional distress resulting from injuries to his child during birth; therefore, it "appears that a father must meet the criteria" for bystander recovery to state a viable claim. (*Burgess*, *supra*, 2 Cal.4th at p. 1078, fn. 8.) In that situation, recovery of emotional distress damages is allowed " 'only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.' " (*Id.* at p. 1073, citing *Thing v. La Chusa* (1989) 48 Cal.3d 644, 647.)

To recover as a bystander, there must be negligent conduct by the defendant that caused injury to the victim. (*Holliday v. Jones* (1989) 215 Cal.App.3d 102, 111 [to recover as a bystander, the plaintiff must "personally witness a negligently caused physical injury to a closely related primary victim"]; CACI No. 1621 [instruction on essential factual elements of negligence claim seeking recovery of damages for emotional distress as a bystander; first element requires the plaintiff to prove the defendant negligently caused injury to, or death of, the victim].)

### C.     Respondents Met Their Initial Burden

In their summary judgment motion, respondents contended the Borbas could not establish three elements of their negligent infliction of emotional distress claim: (1) breach of the standard of care; (2) injury to Boston; and (2) causation. Specifically, respondents argued the expert declarations of Drs. Cragun and Oken established Dr. Erickson did not violate the standard of care and there was no causal relationship between his actions and any alleged injury to Meredith or Boston. Based on this, respondents argued neither Meredith nor Frank could recover as a direct victim—Frank because he did not have a preexisting relationship with Dr. Erickson and Meredith because Dr. Erickson was not negligent, Boston was not injured, and any emotional distress she experienced was not causally connected to Dr. Erickson. Respondents argued the Borbas could not recover as bystanders, since Dr. Erickson did not commit a negligent act and Boston was not injured.

As we set out above, both the direct victim and bystander theories require a showing that the defendant breached his or her duty and caused injury to the victim, namely, Boston. Since the Borbas are suing for emotional distress resulting from Dr. Erickson's provision of services as an obstetrician during Boston's delivery, his duty must be measured by the standard of care for professionals, namely, " 'the duty of the professional to use such skill, prudence and diligence as other members of his profession commonly possess and exercise.' " (*Burgess*, *supra*, 2 Cal.4th at p. 1077.) This is equally true for recovery under the bystander theory, since the Borbas must show Dr. Erickson negligently caused injury to Boston. Since Dr. Erickson is a medical specialist, his duty was to use the skill, prudence, and diligence commonly possessed and exercised by obstetricians. (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968 (*Lattimore*).)[12]

---

[12]    The Borbas contend in their reply brief that because they alleged Dr. Erickson "breached the duty of care owed by *any medical professional* who is present during labor and delivery," the applicable standard of care is that of a medical professional. In making

22.

The standard of care "can only be proved by expert testimony, unless the circumstances are such that the required conduct is within the layperson's common knowledge." (*Lattimore*, *supra*, 239 Cal.App.4th at p. 968.) Thus, where, as here, the plaintiff claims negligence in a medical context, the plaintiff must present evidence from an expert that the defendant breached his or her duty and the breach caused the injury to the plaintiff. (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 (*Powell*).)

Here, respondents presented evidence that Dr. Erickson did not breach the standard of care when he held Boston solely by the neck immediately after his delivery. While Drs. Cragun and Byrne stated there was no *specific* standard of care as to how an obstetrician should hold a newborn immediately following a routine vaginal birth and prior to cutting the umbilical cord, they opined it was not below the standard of care for Dr. Erickson to hold Boston for one to two minutes between those two events as depicted in the photographs and described by the parents. Drs. Cragun, Oken and Byrne each opined Dr. Erickson could not have injured Boston by holding him as described for one to two minutes following birth, as that was an insufficient length of time to cause brain injury or developmental delay.

This evidence was sufficient to show the Borbas could not establish necessary elements of their negligent infliction of emotional distress claim, namely, breach of the standard of care and injury to Boston. (See *Powell*, *supra*, 151 Cal.App.4th at p. 123 [a defendant who supports his summary judgment motion with expert declarations that his

_____

this argument, however, the Borbas cite to the superseded fourth amended complaint. The operative fifth amended complaint does not contain any such allegation. Moreover, since Dr. Erickson's duty derives from his provision of medical services as an obstetrician, Dr. Erickson was required to use the skill, prudence, and diligence possessed and exercised by obstetricians. (*Lattimore*, *supra*, 239 Cal.App.4th at p. 968.)

conduct fell within the community standard of care, " ' "is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence" ' "].)[13]

### D.      *The Borbas Did Not Create a Triable Issue of Material Fact*

Since respondents made a prima facie case the Borbas would not be able to prove breach or injury to Boston, the burden shifted to the Borbas to produce evidence that would create a triable issue of fact on these issues.  As we have stated, expert testimony is required to establish the applicable standard of care, breach, and causation.  Like respondents, the Borbas were required to present expert opinions in their opposition in order to create triable issues of fact.

In support of their opposition, the Borbas only provided Klaas's declaration. Klaas identified herself as a registered nurse with extensive experience in acute care hospitals, but with no apparent training or experience in labor and delivery or neonatal medicine.  Klaas nevertheless stated she was familiar with the standards of care owed delivering mothers and their babies throughout the labor and delivery process, as well as the standard of care on how to hold and assess newborns.  Klaas opined Dr. Erickson breached the standard of care owed Boston by holding him around the neck for one to two minutes following delivery, which caused him to become cyanotic, and there was no medical reason to hold a newborn that way because it can cause cyanosis and block blood flow from the carotid artery to the brain.  In Klaas's medical opinion, it fell below the standard of care for a doctor, nurse, or any staff member participating in a patient's labor and delivery to hold a newborn by the neck for one to two minutes.

---

**13**      While the Borbas assert respondents failed to meet their initial burden, they do not support their claim with any reasoned argument.  As such, we treat the issue as forfeited. (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066 ["[w]hen an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited."]; Cal. Rules of Court, rule 8.204(a)(1)(B) [each point must be separately headed and supported by argument and authority if available].)

Respondents objected to Klaas's declaration on the grounds it was not competent or admissible under Evidence Code section 720 because Klaas was not qualified to render the opinions stated therein and the declaration lacked foundation. The trial court sustained these objections. On appeal, the Borbas argue the trial court improperly weighed the evidence and determined respondents' experts were more credible than their expert, Klaas. Although summary judgment rulings are reviewed de novo, we review the trial court's evidentiary rulings for abuse of discretion. (*Powell*, *supra*, 151 Cal.App.4th at p. 122; *Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1169.)

A party opposing a summary judgment motion may use an expert's declaration to raise a triable issue of fact "provided the requirements for admissibility are established as if the expert were testifying at trial." (*Towns v. Davidson* (2007) 147 Cal.App.4th 461, 472.) The question of whether a witness qualifies as an expert is ordinarily a matter addressed to the sound discretion of the trial court. (*Brown v. Colm* (1974) 11 Cal.3d 639, 646–647.) The trial court abuses its discretion "if the witness has disclosed sufficient knowledge of the subject to entitle his opinion to go before the jury. [Citation.] Indeed, the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal." (*Id.* at p. 647.)

In determining a witness's qualifications to render expert opinion testimony, the test is whether the witness " 'has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates.' " (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 701, quoting Evid. Code, § 720, subd. (a).) When the witness shows sufficient knowledge of the subject to establish the witness's testimony would likely help the jury in its search for the truth, the question of the degree of the witness's knowledge goes more to the testimony's weight than its admissibility. (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 38, overruled on another point in *Perry v. Bakewell Hawthorne, LLC* (2017) 2 Cal.5th 536,

543; *Jeffer, Mangels & Butler v. Glickman* (1991) 234 Cal.App.3d 1432, 1443.) When considering the declarations of the parties' experts on summary judgment, we liberally construe the declarations of the plaintiff's experts and resolve any doubts as to the propriety of granting the motion in favor of the plaintiff. (*Powell*, *supra*, 151 Cal.App.4th at pp. 125–126.)

Even liberally construing Klaas's declaration, it is insufficient to create a triable issue of fact because she failed to state facts to establish foundation for her expertise to provide opinions on the standard of care and whether Boston was injured. To establish her authority to provide an opinion regarding Dr. Erickson's medical negligence and any resulting injury to Boston, Klaas's declaration must contain facts showing she had the training, experience, or necessary skill to render an opinion regarding obstetrical and neonatal medicine. Although Klaas was a registered nurse with extensive experience in acute care hospitals, she did not state she had any training or experience in labor and delivery or neonatal medicine. For this reason, her general statements that she was familiar with the standards of care owed delivering mothers and their babies, the standard of care in how to hold and assess newborns, and the standards of care for doctors under the circumstances pertinent to this litigation, are conclusory and the declaration was of no evidentiary value on the questions of negligence or injury.

While respondents contend that only a physician may render an opinion on the standard of care of another physician, the Borbas assert that is not the case and the only question was whether Klaas's testimony was likely to assist the trier of fact. We agree that, depending on the facts of the case and the specific issues that require expert testimony, someone other than a medical doctor can be an expert on medical issues. (*People v. Catlin* (2001) 26 Cal.4th 81, 131–132 ["[q]ualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion"], overruled on another ground in *People v. Nelson* (2008) 43 Cal.4th 1242, 1253–1256.) Nonetheless, the person making the expert declaration or testifying as an expert must

show they are qualified to provide an opinion on the subject matter. Klaas's declaration is deficient in this regard: she lacks the training and experience to provide an opinion regarding the standard of care an obstetrician would use when delivering a newborn following a routine vaginal birth and before cutting the umbilical cord, and whether holding a newborn by the neck for one to two minutes would cause injury.

The Borbas argue the only reason the trial court excluded Klaas's declaration was because she was a registered nurse, which was not a reasonable basis to exclude her testimony; therefore, the trial court's exclusion of their only expert witness clearly constituted an abuse of direction warranting reversal. This was not the only basis for the trial court's exclusion, however, as the trial court sustained respondents' objections to Klaas's declaration based not only on her qualifications, but also on the ground the declaration lacked foundation because it did not establish a sufficient basis for her opinions or what she relied on in forming them. Even if it was the only basis, we review results, not reasons. (*Green v. Superior Court* (1985) 40 Cal.3d 126, 138 [it is a "settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning"]; *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 19.) As we have explained, the trial court did not abuse its discretion in excluding Klaas's declaration.

Without Klaas's declaration, the Borbas did not have any expert testimony on the issues of standard of care or injury. Accordingly, they have not presented a triable issue of material fact on their claims for negligent infliction of emotional distress by either direct victims or bystanders.

The Borbas argue for the first time on appeal in their reply brief that expert testimony on the standard of care is not required because it is common knowledge not to hold a newborn solely by the neck.[14] It is true that the testimony of qualified experts is

---

**14** We note that we are not obliged to consider arguments or theories that the Borbas did not advance in the trial court. (*DiCola v. White Brothers Performance Products, Inc.*

27.

not necessary if "the conduct required by the particular circumstances is within the common knowledge of the layman." (*Flowers v. Torrance Memorial Hospital Medica Center* (1994) 8 Cal.4th 992, 1001.) "The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' [Citations.] The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery. [Citation.] Otherwise, ' "expert evidence is conclusive and cannot be disregarded." ' " (*Ibid.*, fn. omitted.)

Here, the Borbas claim Dr. Erickson was negligent because he held Boston solely from the back of the neck. The Borbas assert it is common knowledge not to hold a newborn that way, since any teenage babysitter knows this is an unacceptable way to hold a baby and Medical Center registered nurse Shelley Neal testified she did not recall being taught in school not to use a newborn's neck as the sole support. But here, the purportedly negligent conduct occurred, not when a teenager is babysitting a newborn or a nurse is handling a baby in the hospital nursery, but rather during a routine vaginal delivery, when Dr. Erickson was cutting the umbilical cord. The proper way to handle a baby during delivery is not a matter within a layperson's common knowledge. Therefore,

---

(2008) 158 Cal.App.4th 666, 676 [the rule that an argument or theory will not be considered if raised for the first time on appeal applied to the appellate review of summary judgments; therefore, " 'possible theories that were not fully developed or factually presented to the trial court cannot create a "triable issue" on appeal' "].) We also need not consider this argument because appellate courts have concluded issues first raised in a reply brief will not be considered absent a showing of good cause for delay. (*Save the Sunset Strip Coalition v. City of West Hollywood* (2001) 87 Cal.App.4th 1172, 1181, fn. 3 ["Consistent with well-established authority, absent justification for failing to present an argument earlier, we will not consider an issue raised for the first time in a reply brief."].)

the Borbas cannot rely on the common knowledge exception as a defense against summary judgment.

The Borbas also contend for the first time on appeal in their reply brief that in addition to Klaas, they presented expert testimony from three other "qualified experts," namely, Dr. Erickson, nurse Neal, and Meredith. They assert that testimony from any one of these individuals was sufficient to defeat summary judgment. Since they failed to raise this issue in the trial court and only asserted it for the first time in their reply brief, we need not consider it. Moreover, none of these individuals submitted a declaration establishing their credentials as experts and the deposition excerpts that the Borbas submitted in opposition to their motion do not establish this.[15]

We understand people in the Borbas' situation might feel distressed. The standard of care when delivering a baby, however, is to be measured by the standard of care of a medical professional. Respondents established that Dr. Erickson did not breach the standard of care through the declarations of their medical doctors, shifting the burden of producing evidence to create a triable issue of fact to the Borbas. Because Klaas's declaration was insufficient to create a triable issue of material fact and the Borbas provided no other evidence of medical negligence, we have no choice but to affirm the

---

[15] None of the testimony the Borbas cite establishes that any of these individuals offered an opinion on the standard of care applicable to this case and breach of that standard. That Dr. Erickson admitted holding Boston solely by the neck does not establish the applicable standard of care or breach of that standard. While the Borbas cite Dr. Erickson's written discovery responses could be used to establish negligence, those responses were not presented with respect to the summary judgment motion, but rather the motion to compel. While Neal, who had been a registered nurse since 1992 and worked at the Medical Center as a postpartum nurse, testified she did not recall ever seeing a physician hold a baby by the neck during delivery and she had never held a baby that way, she did not testify it was below the standard of care for an obstetrician to hold a baby solely by the neck under the circumstances of this case. Finally, Meredith's observations of Dr. Erickson's conduct and its effect on Boston do not establish that Dr. Erickson acted below the standard of care.

trial court's grant of summary judgment on the ground the Borbas cannot prove breach of the standard of care. Accordingly, we do not decide the other grounds respondents raised to support the motion, such as whether the Borbas had contemporaneous awareness of an injury-producing event because Dr. Erickson did not injure Boston.

## II.     The Demurrer

The Borbas contend the trial court erred when it sustained respondents' demurrer to their intentional infliction of emotional distress claim alleged in the fourth amended complaint.[16]

Intentional infliction of emotional distress requires: (1) extreme and outrageous conduct by the defendant; (2) that the defendant intended to cause, or recklessly disregarded the probability of causing, emotional distress; (3) severe emotional distress; and (4) actual and proximate causation of emotional distress by the defendant's outrageous conduct. (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1050; *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 300.) "A defendant's conduct is 'outrageous' when it is so ' " 'extreme as to exceed all bounds of that usually tolerated in a civilized community.' " ' " (*Hughes v. Pair*, at pp. 1050–1051.)

In their intentional infliction of emotional distress claim, the Borbas alleged Dr. Erickson's conduct of holding a baby by the neck with such force that he turned blue was "conduct outside the bounds of conduct tolerated by any reasonable member of society," "so extreme in degree that it exceeded all possible bounds of decency," and "atrocious and utterly intolerable in any civilized community." They specifically alleged

---

[16]     The Borbas also mention that the trial court granted respondents' motion to strike the photo of Dr. Erickson "choking" Boston that was published in the fourth amended complaint. To the extent the Borbas intend to argue the trial court erred in granting the motion to strike, they do not make any reasoned argument or cite to any authority to support any such claim. As such, we treat the issue as forfeited. (*Tellez v. Rich Voss Trucking, Inc.*, *supra*, 240 Cal.App.4th at p. 1066; Cal. Rules of Court, rule 8.204(a)(1)(B).)

there was "no excuse for a medical professional to grasp a baby by the neck, in anger or otherwise, depriving it of oxygen during its birth."  They further alleged: (1) Dr. Erickson "acted with reckless disregard of the probability" that they "would suffer emotional distress, knowing that [they] were present when the conduct occurred"; (2) they "suffered severe emotional distress … at being forced to watch their baby be deprived of oxygen immediately upon his birth"; and (3) Dr. Erickson's "conduct was a substantial factor in causing this severe emotional distress."

 In their demurrer, respondents argued none of the elements were pled with particularity and the allegations were conclusory.  On appeal, the Borbas argue they pled sufficient facts to satisfy each element of their intentional infliction of emotional distress claim.

We need not decide whether the trial court erred in sustaining the demurrer because any error was harmless.  Had the claim survived demurrer, it necessarily would have failed on summary judgment.  (See Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 [" '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error' "]; see also *Grell v. Laci Le Beau Corp.* (1999) 73 Cal.App.4th 1300, 1307 [error harmless when subsequent summary judgment on statute-of-limitations grounds would have disposed of claims erroneously dismissed on demurrer]; *Curtis v. Twentieth Century-Fox Film Corp.* (1956) 140 Cal.App.2d 461, 464–465 [when two claims were based on the same factual allegations, plaintiff was not prejudiced by erroneous ruling sustaining a demurrer to one claim when the second claim was resolved against plaintiff after trial].)

The Borbas' negligent and intentional infliction of emotional distress claims were based on the same factual allegations.  The undisputed facts on the summary judgment motion established Dr. Erickson acted within the standard of care when he held Boston

by the neck following his delivery and before cutting the umbilical cord. The provision of medical services in accordance with the standard of care is not outrageous under the applicable standard, which requires conduct to be so extreme as to exceed all bounds usually tolerated in a civilized society. (*Hughes v. Pair*, *supra*, 46 Cal.4th at pp. 1050–1051.) If it was error to sustain the demurrer as to the intentional infliction of emotional distress claim, the error obviously was not prejudicial.

## III.    The Motion to Compel

The Borbas contend the trial court erred in denying their motion to compel discovery of documents related to communications with Drs. Cragun and Oken because, regardless of whether they were formally disclosed as experts, Dr. Erickson forfeited the right to shield communications with them from discovery by relying on their opinions in support of the summary judgment motion. The Borbas assert that by submitting their declarations in support of the summary judgment motion, respondents made these doctors testifying experts subject to pretrial discovery.

Ordinarily, until a party's consultants are designated to testify as expert witnesses, their opinions and reports are not discoverable. (§§ 2034.210, 2034.410, 2034.415; *County of Los Angeles v. Superior Court* (1990) 222 Cal.App.3d 647, 654–655 [an expert consultant's work is protected by the attorney work product privilege, but once it appears reasonably certain the expert will testify as a witness on a material matter in dispute, the privilege no longer applies and the expert's opinions are subject to discovery and disclosure].) The requirements for disclosure of expert witness information are set forth in sections 2034.210 through 2034.720. After an initial trial date has been set in an action, "any party may obtain discovery by demanding that all parties simultaneously exchange information concerning each other's expert trial witnesses." (§ 2034.210.) Upon service of such a demand, "[a]ll parties who have appeared in the action shall exchange information concerning expert witnesses in writing on or before the date of exchange specified in the demand," and produce the designated expert's "discoverable

32.

reports and writings" if the demand includes a demand for production of reports or writings.  (§§ 2034.260, 2034.270.)  "On receipt of an expert witness list from a party, any other party may take the deposition of any person on the list[,]" and the expert must produce any materials called for by the deposition notice.  (§§ 2034.410, 2034.415.)

In this case, it appears no demand for exchange of information concerning expert witnesses had been served when the Borbas propounded the request for production of documents.  Therefore, Dr. Erickson's communications with Drs. Cragun and Oken were not discoverable.  Nevertheless, "where a party presents evidence that raises a significant question relating to the foundation of an expert's opinion filed in support of or in opposition to a motion for summary judgment or summary adjudication, a deposition limited to that subject should be allowed."  (*St. Mary*, *supra*, 50 Cal.App.4th at p. 1534.)  Whether to compel such a deposition falls within the sound discretion of the trial court (*Id.* at p. 1540.)

In *St. Mary*, the plaintiffs produced a retained medical expert's declaration in opposition to the defendants' summary judgment motion.  (*St. Mary*, *supra*, 50 Cal.App.4th at pp. 1534–1535.)  When the defendants took their motion off calendar and attempted to depose the expert, the plaintiffs objected, arguing the expert could not be deposed until the parties exchanged expert witness lists pursuant to former section 2034.  (*St. Mary*, at pp. 1534–1535; former § 2034 [repealed by Stats. 2004, ch. 182, § 22, operative July 1, 2005]; see now §§ 2034.010 et seq. [added by Stats. 2004, ch. 182, § 23].)  The trial court denied the defendants' ensuing motion to compel the expert's deposition.  (*St. Mary*, at p. 1537.)

The appellate court reversed, concluding the trial court abused its discretion in failing to allow the discovery.  (*St. Mary*, *supra*, 50 Cal.App.4th at p. 1540.)  The appellate court recognized the juxtaposition of the time requirements of former section 2034 and section 437c was problematic for litigants in drafting and noticing effective summary judgment motions, as there was little time to depose opposition

experts after the designation of experts but before the deadline to notice a summary judgment motion.  (*St. Mary*, *supra*, 50 Cal.App.4th at p. 1538.)  The appellate court realized it would defeat the summary procedure's purpose to recognize a party's absolute right to depose anyone providing evidence in support of or opposition to a summary judgment motion; on the other hand, the concept of a summary procedure would be defeated if the opposing party were allowed to defeat the motion by less than candid declarations.  (*Ibid.*)  The appellate court, therefore, believed "in proper circumstances the court should allow a party to a summary proceeding the opportunity to take limited discovery which may effectively dispose of the proceeding."  (*St. Mary*, *supra*, 50 Cal.App.4th at pp. 1538–1539.)

The appellate court believed that situation was present there, as the defendants' counsel presented information from which a serious question arose as to whether the plaintiffs' expert's declaration was factually incorrect.  (*St. Mary*, *supra*, 50 Cal.App.4th at p. 1540.)  The court noted it was possible if the expert were deposed, he may concede his error if confronted with proof he may have been mistaken.  (*Ibid.*)  Moreover, the defendants' counsel submitted evidence which suggested the bases for the expert's conclusions were untenable.  (*Ibid.*)  The court cautioned the process should not be utilized to turn summary proceedings into mini trials.  (*Ibid.*)  The court held where a party presents "objective facts" that "create a significant question regarding the validity of the affidavit or declaration which, if successfully pursued, will impeach the foundational basis of the affidavit or declaration in question," the trial court has the discretion to allow additional discovery.  (*Id.* at pp. 1540–1541.)

Here, the Borbas do not cite any objective facts that create a significant question as to the validity of the declarations of Drs. Cragun or Oken which, if successfully pursued, would impeach the foundational bases of their declarations.  The Borbas assert their declarations lack veracity and were based on untenable facts because they did not review Dr. Erickson's deposition, deposition exhibits, and physician notes.  The Borbas

34.

believe if these experts were confronted with admissions in Dr. Erickson's deposition and written discovery responses, they would have been led to at least question, if not reevaluate, their own findings. They specifically cite to Dr. Erickson's deposition testimony about one of the photographs of him holding Boston, which he testified: (1) showed a newborn baby covered with a lot of vernix being wiped off; (2) he held the baby in the manner depicted in the photograph "[b]ecause it was the only way to hold the baby at that time," as the baby "was covered with the vernix" and "was very slippery," and he was not able to get ahold of the baby any other way; and (3) it did "appear as though the baby is being held with the fingers around the neck." They also cite to Dr. Erickson's written discovery responses, in which he admitted he did not possess any documents that supported his contention he acted within the standard of care with respect to the care he provided Meredith, Boston, or Frank.

We fail to see how Dr. Erickson's deposition testimony and assertion that he did not have any documents to show he acted within the standard of care show that the declarations of Drs. Cragun and Oken were factually incorrect or make their conclusions untenable. Both Drs. Cragun and Oken declared they reviewed Meredith's deposition and the color photo exhibits attached thereto depicting Dr. Erickson holding Boston. Based on their review of the medical records, the Borbas' version of events and the photographs, Dr. Cragun determined Dr. Erickson did not breach the standard of care and Dr. Oken determined Dr. Erickson did not cause any of Boston's claimed injuries. It would not have made any difference had they reviewed Dr. Erickson's testimony he held Boston the same way as depicted in the photographs. Moreover, Dr. Erickson's explanation as to why he held Boston in that manner, or whether Dr. Erickson possessed documents showing the standard of care, has no bearing on the opinions of Drs. Cragun and Oken on the standard of care and injury to Boston.

The Borbas contend *St. Mary* "was clearly rejected in substance, if not in name" in *DeLuca v. State Fish Co., Inc.* (2013) 217 Cal.App.4th 671. We disagree. In *DeLuca*,

the appellate court was reviewing a motion to disqualify opposing counsel based on allegedly improper conduct between opposing counsel and the movant's expert witness. (*Id.* at pp. 680–681, 686.)  In discussing the application of the attorney-client privilege and work product protection to communications between counsel and an expert witness, the court explained that while both applied to experts solely retained as a consulting expert, generally neither will prevent disclosure of statements to, or reports from, a testifying expert.  (*Id.* at pp. 688–689.)  The court further explained that once a testifying expert is *designated as a witness*, the attorney-client privilege no longer applies, and when the expert is expected to testify, the expert's report becomes discoverable, noting the discovery statutes provide for the mutual exchange of testifying experts' reports, citing section 2034.210, subdivision (c).  (*DeLuca*, at p. 689 & fn. 19.)

Rather than reject *St. Mary*, *DeLuca* confirms the attorney-client privilege and work product protections apply until an expert witness is designated as a witness in accordance with the discovery statutes.  *DeLuca* did not address the issue presented in *St. Mary*, namely, whether expert witness reports are discoverable prior to the simultaneous exchange of expert witness information when an expert provides a declaration in connection with a summary judgment motion.  The trial court did not abuse its discretion when it relied on *St. Mary* and determined the Borbas were not entitled to the discovery they requested.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to respondents.

DE SANTOS, J.

WE CONCUR:


POOCHIGIAN, Acting P.J.


MEEHAN, J.